IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SALLY VAUGHN, | § | |
|     Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-05-2539 |
| | § | |
| UNIVERSITY OF HOUSTON, *et al.* | § | |
|     Defendants. | § | |

### **MEMORANDUM AND ORDER**

In this employment discrimination and civil rights case, Defendants have filed a Motion for Summary Judgment [Doc. # 52] ("MSJ" or "Motion"), Plaintiff has responded [Doc. # 76], and Defendant has replied [Doc. # 78]. Having considered the parties' briefing, the applicable legal authorities, and all matters of record, the Court concludes that the Motion should be **granted**.

**I.     BACKGROUND**

Plaintiff Sally Vaughn is a full tenured professor in the History Department at the University of Houston ("UH"), where she has taught since 1981. In her Second Amended Complaint [Doc. # 42], she asserts claims under Title VII, 42 U.S.C. § 2000e *et seq*., for gender discrimination and retaliation. She also brings claims under 42 U.S.C. §§ 1981 and 1983 for violations of her rights to free speech and association, due process, and equal protection.

Plaintiff's complaints fall into two basic categories. First, she alleges that she has suffered harassment and retaliation because of her actions during the 1990s regarding Fabian Vaksman, a controversial graduate student in her department. Second, she alleges that her salary is lower than other salaries in her department because she is a woman. The relevant facts are set out below, viewed in the light most favorable to Plaintiff.

Mr. Vaksman arrived at UH in 1983, where he remained through the mid-1990s. Mr. Vaksman was outspoken and highly critical of certain UH policies and, as a result, was dismissed from UH in 1986. Plaintiff, along with her colleagues, voted to dismiss Mr. Vaksman, although she states that she later regretted her vote. Mr. Vaksman then wrote a satirical novel whose characters were thinly disguised members of the history department faculty. This publicity caused some faculty members to fear for their safety. Mr. Vaksman also filed federal and state lawsuits against UH. The record contains no detailed information about his federal suit, but the state lawsuit, in which he asserted claims for due process and freedom of expression, resulted in a judgment for Mr. Vaksman.[1] Mr. Vaksman was reinstated to UH.

Motivated by her regret for her original vote to dismiss Mr. Vaksman, Plaintiff

---

[1] *Alcorn v. Vaksman*, 877 S.W.2d 390 (Tex. App.–Houston [1st Dist.] 1994).

volunteered to direct Mr. Vaksman's dissertation committee after his reinstatement. Plaintiff states that, from that point on, she was shunned and subject to "outright hostility" from other members of the History Department, and that she was targeted for retaliation. For years previously, Plaintiff had co-founded and nurtured the Haskins Society Conference, a major conference in Plaintiffs' field that she describes as her "intellectual child," and which had been hosted by UH since its inception in 1982. After she agreed to serve on Mr. Vaksman's dissertation committee, UH refused to continue to sponsor the conference, and the conference moved to Cornell University. Plaintiff claims that the loss of the conference was demeaning and deeply damaging to her standing in her academic field. Plaintiff also claims that she was excluded from important committees, and was ostracized and publicly ridiculed by fellow faculty members. She states that "[t]he harassment, discrimination and hostile work environment escalated to the point of making [her] physically ill, and she was hospitalized for a period of time."[2] The dates of Plaintiffs' hospitalization are not in the record, but presumably were in the late 1990s.

Plaintiff also argues that her salary is inequitable. She claims that, in the summer of 2002, UH disbursed a large sum of money to the History Department with instructions to distribute the money among women and minorities in the department,

---

[2] Response, at 4.

as remediation for past discrimination in pay, but that instead the money was distributed to five white, male professors.[3] She alleges that she had been identified by Dr. Joseph Pratt, who in 2002 became Chair of the History Department, as "the one historically underpaid full professor" in the department.[4] Plaintiff states that, in 2002 and 2003, both Dr. Pratt and Dr. John Antel, then Dean of the College of Liberal Arts and Social Sciences, told her that she was underpaid because she is a woman.[5] She states that Dr. Antel apologized and asked Plaintiff to let him try to "work it out within the system" before she took any legal action, and that Plaintiff "agreed to wait until after he had exhausted his efforts on my behalf."[6] She then followed up with Dr. Antel "[f]rom time to time," until, in June 2004, Dr. Antel told her he had done all he

---

[3] Plaintiff's Verification (Exhibit 5 to Response), ¶ 21. Defendants characterize the 2002 disbursement differently, stating that instructions from UH's President and Provost made clear that scholarly productivity, and retention of faculty who could be hired away from UH, were the "driving forces" of the 2002 raises. MSJ, at 4-5 (citing Affidavit of Dr. Robert C. Palmer (Exhibit G to MSJ) and its attachments). Defendant states that equity for strongly performing women and minorities was one factor in the decisions, but that productivity and retention were the key factors. MSJ, at 4-5; Palmer Affidavit, ¶¶ 6-7.

[4] Response, at 5. Plaintiff purports to quote from a letter written by Dr. Pratt, which was attached as Exhibit 1 to his deposition. However, the letter is not in the record. Even assuming Plaintiff's quotation is accurate, it does not link the underpayment to gender discrimination.

[5] Plaintiff's Verification, ¶¶ 22, 25. Defendants have objected to both of these paragraphs as hearsay. Reply, at 6. The Court nevertheless considers the statements in the interest of justice. They do not affect the outcome of this case.

[6] *Id.*

could, and suggested that she file an internal grievance instead of an EEOC charge.[7] Plaintiff responded "that [she] was going to try one last time at the department level and then if that did not work talk to a lawyer."[8]

In August 2004, Plaintiff met with Dr. Susan Kellogg, the incoming chair of the department, who told Plaintiff she was working on equity pay criteria.[9] On November 11, 2004, Dr. Kellogg presented her revised equity pay criteria at a department meeting, but Plaintiff's concerns still were not addressed. Plaintiff states, "I remained the lowest paid of the full professors and other women were similarly situated on the bottom of the payscale."[10]

Defendants, relying on an affidavit from Dr. Antel, assert that Plaintiff's lower salary was due to "salary compression," a "phenomenon where salaries of faculty in a given department who have been in the department for a long period of time do not increase at a rate where it can keep pace with market forces."[11] This phenomenon results in "more recently-hired, even lower ranked, faculty . . . being compensated at

---

[7]     *Id.* ¶¶ 26, 28.

[8]     *Id.* ¶ 28.

[9]     *Id.* ¶ 29.

[10]    *Id.* ¶ 30.

[11]    Affidavit of Dr. John J. Antel (Exhibit B to MSJ), ¶ 4.

a rate similar to faculty who have been with the university for years."[12]  Dr. Antel states that Plaintiff's salary was raised at least three times since 2002, when he became Dean of the History Department.[13]  Plaintiff does not contest that she received raises, but argues that they did not adequately address the inequity.  A compilation of salary data presented by Plaintiff states that she received raises in the 2002-03 and 2003-04 school years.[14]

On January 27, 2005, Plaintiff filed a Charge of Discrimination with the EEOC, alleging sex discrimination and retaliation.[15]  In the EEOC Charge, Plaintiff complains that she was retaliated against and suffered a hostile work environment because of her work with Dr. Vaksman.  Plaintiff does not tie these claims of retaliation and hostile environment to gender discrimination.  The Charge also states that, in 2002, Plaintiff learned that she was the lowest paid full professor in the History Department, despite her scholarly achievements and standing, that Dr. Pratt and Dr. Antel had asked for time to correct the disparate salaries, and that she had followed up with them until, in June 2004, she was told by Dr. Antel that he could not

---

[12]     *Id.*

[13]     *Id.* ¶ 9.

[14]     *See* Exhibit 5-C to Response.  Although raises presumably were also awarded for the 2004-05 academic year, the record contains no information as to whether Plaintiff received a pay raise for that year.

[15]     EEOC Charge of Discrimination (Exhibit A to MSJ) ("EEOC Charge").

help. Plaintiff states that she did not file the EEOC Charge sooner because of assurances by the administration that they were working to address the inequitable pay.

On or about April 22, 2005, Plaintiff received a notice of right to sue from the EEOC. On July 21, 2005, Plaintiff filed suit in this Court.

## II.     SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the party's case, and on which that party will bear the burden at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc); *see also Baton Rouge Oil and Chem. Workers Union v. ExxonMobil Corp.,* 289 F.3d 373, 375 (5th Cir. 2002). In deciding a motion for summary judgment, the Court must determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits filed in support of the motion, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp.*, 477 U.S. at 322–23; *Hart v. Hairston*, 343 F.3d 762, 764 (5th Cir. 2003).

For summary judgment, the initial burden falls on the movant to identify areas essential to the non-movant's claim in which there is an "absence of a genuine issue of material fact." *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005). The moving party, however, need not negate the elements of the non-movant's case. *See Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005). The moving party may meet its burden by pointing out "'the absence of evidence supporting the nonmoving party's case.'" *Duffy v. Leading Edge Products, Inc.*, 44 F.3d 308, 312 (5th Cir. 1995) (quoting *Skotak v. Tenneco Resins, Inc.,* 953 F.2d 909, 913 (5th Cir. 1992)).

If the moving party meets its initial burden, the non-movant must go beyond the pleadings and designate specific facts showing that there is a genuine issue of material fact for trial. *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001) (internal citation omitted). "An issue is material if its resolution could affect the outcome of the action. A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party" *DIRECT TV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2006) (internal citations omitted).

In deciding whether a genuine and material fact issue has been created, the facts and inferences to be drawn from them must be reviewed in the light most favorable to the nonmoving party. *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336

F.3d 410, 412 (5th Cir. 2003).  However, factual controversies are resolved in favor of the non-movant "only when there is an actual controversy—that is, when both parties have submitted evidence of contradictory facts."  *Olabisiomotosho v. City of Houston,* 185 F.3d 521, 525 (5th Cir. 1999).  The non-movant's burden is not met by mere reliance on the allegations or denials in the non-movant's pleadings.  *See Diamond Offshore Co. v. A&B Builders, Inc.*, 302 F.3d 531, 545 n.13 (5th Cir. 2002).  Likewise, "unsubstantiated or conclusory assertions that a fact issue exists" do not meet this burden.  *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998).  Instead, the nonmoving party must present specific facts which show "the existence of a 'genuine' issue concerning every essential component of its case." *Id.* In the absence of any proof, the court will not assume that the non-movant could or would prove the necessary facts. *Little*, 37 F.3d at 1075 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

Affidavits cannot preclude summary judgment unless they contain competent and otherwise admissible evidence.  *See* FED. R. CIV. P. 56(e); *Love v. Nat'l Medical Enters.*, 230 F.3d 765, 776 (5th Cir. 2000); *Hunter-Reed v. City of Houston*, 244 F. Supp. 2d 733, 745 (S.D. Tex. 2003).  A party's self-serving and unsupported statement in an affidavit will not defeat summary judgment where the evidence in the record is to the contrary.  *See In re Hinsely*, 201 F.3d 638, 643 (5th Cir. 2000).

Finally, "[w]hen evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court." *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003). "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *See id.* (internal citations and quotations omitted).

## III. ANALYSIS

### A. Title VII Claims of Discrimination and Retaliation are Time-Barred

#### 1. All Alleged Discriminatory Acts are Outside Limitations Period

In Texas, a person claiming unlawful discrimination or retaliation must file a charge of discrimination with the EEOC within 300 days "after the alleged unlawful employment practice occurred." *EEOC v. WC&M Enters., Inc.*, 496 F.3d 393, 398 (5th Cir. 2007); *Frank v. Xerox Corp.*, 347 F.3d 130, 136 (5th Cir. 2003).[16] Because Plaintiff filed her EEOC Charge on January 21, 2005, the cutoff for alleged unlawful

---

[16] Title VII requires that an EEOC charge be filed within 180 days of the alleged discriminatory practice, but extends the limitations period to 300 days if a claim is also filed with a state or local agency. *Griffin v. City of Dallas*, 25 F.3d 610, 612 (5th Cir. 1994) (citing 42 U.S.C. § 2000e-5(e)(1)). In Texas, under a Worksharing Agreement between the EEOC and the Texas Commission on Human Rights (TCHR), the TCHR has designated the EEOC as a limited agent of the TCHR for purposes of receiving charges of discrimination. *Id.* Thus, when the EEOC receives a complaint, the TCHR also nominally receives it, instituting state proceedings under Title VII and extending the limitations period to 300 days. *Id.* at 612-13.

conduct falls in late March, 2004.

Plaintiff's gender discrimination claim in her EEOC Charge and Second Amended Complaint focuses on the 2002 distribution of money, which is well outside the limitations period.[17] The only later actions alleged by Plaintiff—in other words, actions that might be within the EEOC charging period—relate to Defendants' failure to adequately address or remedy the 2002 distribution.[18] Plaintiff clearly knew of the allegedly discriminatory pay in 2002, as confirmed by her own writings stating she was contemplating going to the EEOC as early as September 2002.[19] She chose not to pursue an internal grievance with the UH grievance committee, as recommended by Dr. Antel, because the grievance might have resulted in a raise of about one thousand dollars, which Plaintiff considered inadequate to remedy her salary

---

[17] EEOC Charge (Exhibit A to MSJ); Second Amended Complaint [Doc. # 42], at 8-15.

[18] *See* EEOC Charge ("In June 2004, I again met with Dean Antel and he said that there was nothing he could do.  In the Fall, I met with the new Chair, Sue Kellogg. . . .  She advised me to wait before filing a complaint and give her a chance to study the situation."); Second Amended Complaint, at 8-15 (discussing the 2002 disbursement and Plaintiff's attempts, through 2004, to obtain remediation of the allegedly discriminatory pay).

[19] Plaintiff's letter to UH President Smith, which she drafted in September 2002 but never sent, states that she could "ultimately be forced to go to the EEOC as a last resort."  Plaintiff's Unsent Letter, dated Sept. 19, 2002 (Exhibit H to MSJ); Plaintiff's Deposition (Exhibit C to MSJ), at 159-65.  This letter alleges many possible causes of the pay inequity, focusing mainly on salary discrimination against professors who teach European history, but also mentioning retaliation against Plaintiff for her work with Mr. Vaksman and the 2002 distribution which had gone to three white, male professors.

inequity.[20]

A past discriminatory act that is outside the limitations period cannot be sued upon, even if the prior act has consequences (such as lowered salary) that reach into the limitations period. *See Ledbetter v. Goodyear Tire & Rubber Co., Inc.*, 127 S. Ct. 2162 (2007); *Randle v. Local 28 Int'l Longshoremens Ass'n /AFL-CIO*, No. 07-20384, 2007 WL 4170714 (5th Cir. Nov. 20, 2007). The plaintiff in *Ledbetter* argued that a decision to deny her a pay raise, which was inside the limitations period, was unlawful because it "carried forward" the effects of prior, intentionally discriminatory disparities that were outside the limitations period and had not been the subject of an EEOC charge.[21] The Supreme Court rejected her argument because Ledbetter had not asserted that the denial of a pay raise (or the paychecks issued during the limitations period) were decisions made with "actual discriminatory intent."[22] The Court further stated, "We . . . reject the suggestion that an employment practice committed with no improper purpose and no discriminatory intent is rendered unlawful nonetheless because it gives some effect to an intentional discriminatory act that occurred outside

---

[20] Plaintiff's Deposition, at 158-59.

[21] *Ledbetter*, 127 S. Ct. at 2167 (internal quotation marks and citation omitted).

[22] *Id.* at 2167.

the charging period."[23]

Plaintiff's gender claim clearly focuses on the 2002 distribution of funds, which she alleges was intentionally discriminatory. She has not presented evidence of a pay raise denial, or any other intentionally discriminatory action, within 300 days of her EEOC Charge. Her claims that Defendants told her they would attempt to remedy the inequity, but then failed to do so, do not qualify as decisions made with "actual discriminatory intent."[24] Her allegations clearly are time-barred under *Ledbetter*.[25]

As for Plaintiff's retaliation and hostile environment claims, the relevant events happened even earlier, in the 1990s. Mr. Vaksman was reinstated to UH after the

---

[23] *Id*. at 2172.

[24] *See id.* at 2167.

[25] Apart from Plaintiff's limitations problems, her evidence of gender discrimination is very thin. To establish discriminatory intent, Plaintiff relies heavily on statements by Drs. Antel and Pratt, to which Defendants object as hearsay, that she was underpaid because she is a woman. Plaintiff's Verification, ¶¶ 22, 25. In her deposition, Plaintiff attributed the salary disparity primarily to the Vaksman incident, and stated that it could also have been because European history is not a priority for UH's History Department. Plaintiff's Deposition, at 132-33. Both factors are, of course, irrelevant to a gender discrimination claim. Only later—when defense counsel raised the issue—did Plaintiff state that she believed gender discrimination also was a factor in her salary. *Id*. at 152-53. However, she also admitted that other women who are full professors in the history department earn more than she does. *Id*. at 169. Defendants have presented evidence that the 2002 raises were driven primarily by scholarly productivity and the desire to retain strong faculty who could be lured away from UH. MSJ, at 4-5; Palmer Affidavit (Exhibit G to MSJ). Plaintiff acknowledged in her deposition that she had a difficult, years-long path to publication of her book, which was finally published in 2002—the same year as the salary distribution she objects to as discriminatory. Plaintiff's Deposition, at 172. She also acknowledged that she had withdrawn from competitive job interviews because she had decided to stay in Houston. *Id.* at 174-75.

1994 state court judgment in his favor and, soon thereafter, Plaintiff volunteered to direct his dissertation committee. Plaintiff alleges that, because of this, she was shunned and ostracized by other department members and that, in the late 1990s, her Haskins Society Conference was "evicted" from UH.[26] Plaintiff does not allege any discriminatory conduct within the 300 days before her EEOC Charge that could serve as a component act of a hostile environment claim; similarly, she does not allege any retaliatory conduct within the 300 days or after the Charge was filed.[27] Like her gender discrimination claim, Plaintiff's Title VII retaliation and hostile environment claims clearly are time-barred.[28]

---

[26]   Plaintiff's Verification (Exhibit 5 to Response), ¶¶ 14-19.

[27]   *See* 42 U.S.C. § 2000e-5(e)(1); *WC&M Enters.*, 496 F.3d at 398.

[28]   In addition, Plaintiff's retaliation claim is not substantively cognizable under Title VII. A Title VII retaliation claim requires proof that the plaintiff engaged in a protected activity (by either opposing an employment practice that is unlawful under Title VII, or by filing an EEOC charge) and suffered an adverse employment action as a result of the protected activity. *See Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 348 (5th Cir. 2007); *Baker v. American Airlines, Inc.*, 430 F.3d 750, 755 (5th Cir. 2005). Plaintiff did file an EEOC charge in 2005, but she cannot show that the alleged retaliation was motivated by this protected activity because all of the adverse employment actions alleged by Plaintiff *preceded* her EEOC Charge. *See* Response, at 13-14. Plaintiff also alleges that she was retaliated against because of her actions surrounding Mr. Vaksman. *See* Response, at 13-14 (arguing Plaintiff engaged in a protected activity when she "opposed the discrimination" against Mr. Vaksman upon his readmission to UH, and volunteered to head his dissertation committee); *see also id.*, at 3; Second Amended Complaint, at 18. However, the record contains no evidence that the rights asserted by Mr. Vaksman in his suit were rights under Title VII, which protects against employment discrimination based on race, gender, color, religion, or national origin. Instead, Mr. Vaksman asserted his rights to due process and freedom of expression. *Alcorn v. Vaksman*, 877 S.W.2d 390 (Tex. App.–Houston [1st Dist.] 1994). Because there is no evidence that Plaintiff's activity regarding Mr. Vaksman
(continued...)

## 2. Equitable Tolling Does Not Apply

Plaintiff argues that her time-barred claims should be allowed under the equitable tolling doctrine, because Dean Antel and others asked her to wait before filing an EEOC charge to see if they could address her concerns. Equitable tolling is proper when the employee's delay in filing a discrimination charge is attributable to misconduct by the defendant:

> The doctrines of equitable tolling and equitable estoppel remain available to those plaintiffs who, ***through no fault of their own***, might otherwise be barred from bringing a claim by operation of a statute of limitations. *See Ramirez v. City of San Antonio,* 312 F.3d 178, 183 (5th Cir.2002) ("We have found that equitable tolling may be appropriate when 'the plaintiff is actively misled by the defendant about the cause of action or is prevented in some extraordinary way from asserting his rights.'"); *Tyler v. Union Oil Co. of California,* 304 F.3d 379, 391 (5th Cir.2002) ("The doctrine of equitable estoppel 'may properly be invoked when the employee's untimeliness in filing his charge results from either the employer's deliberate design to delay the filing *or* actions that the employer should unmistakably have understood would result in the employee's delay.'").

*Jones v. Alcoa*, 339 F.3d 359, 368 (5th Cir. 2003), *cert. denied*, 540 U.S. 1161 (2004) (emphasis added).

Taking Plaintiff's allegations as true, UH officials made mere requests that she delay her filing, without any threat or other coercion. Plaintiff testified at deposition that Dr. Antel had "made promises" and "asked [her] to wait," but ultimately "he

---

<sup>28</sup> (...continued)
involved opposition to an employment practice that is unlawful under Title VII, it cannot qualify as "protected activity" under the statute. *See Turner*, 475 F.3d at 348.

either didn't or couldn't do anything to bring my salary up to the standards of . . . the profession."[29]  She testified that Dr. Antel had not threatened her or told her not to file a lawsuit.[30]  Regarding Dr. Pratt and Dr. Kellogg, Plaintiff testified that both had agreed to look into the salary issue, but that they had ***not*** told her, "Don't file a charge of discrimination against the university or . . . we can't look into these salary issues."[31]  Instead, when Plaintiff told them she was thinking of filing a charge, "they said, 'We want to work on taking care of it.'"[32]  Plaintiff clearly was aware of her right to file with the EEOC and of filing deadlines,[33] but chose not to file with the EEOC until 2005.  Equitable tolling does not apply to Plaintiff's claims.

## B. Defendants Are Not Subject to Claims under 42 U.S.C. §§ 1981 and 1983

Plaintiff's suit originally was filed against four Defendants: (1) UH, (2) Jay Gogue, President of UH, in his official capacity, (3) Dr. Antel, in his official and individual capacities, and (4) Dr. Kellogg, in her official and individual capacities. On December 4, 2007, the Court granted Plaintiffs' motion to voluntarily dismiss

---

[29] Plaintiff's Deposition, at 161.

[30] *Id*.

[31] *Id*. at 165.

[32] *Id*.

[33] *Id*. at 157-165; Plaintiff's Unsent Letter to UH President Smith, dated Sept. 19, 2002 (Exhibit H to MSJ) (last paragraph discusses going to the EEOC "as a last resort").

Defendants Kellogg and Antel in their individual capacities.  *See* Order [Doc. # 55]. Therefore, the only remaining Defendants in this case are the University of Houston and UH officials sued in their official capacities.

Plaintiff's claims under 42 U.S.C. §§ 1981 and 1983 must fail.  Neither the University of Houston, which is a state educational agency, nor state officials acting in their official capacity may be sued under 42 U.S.C. § 1983.  *Will v. Mich. Dept. of State Police*, 491 U.S. 58, 70-71 (1989); *Stotter v. Univ. of Tex. at San Antonio*, 508 F.3d 812, 821 (5th Cir. 2007).  Moreover, 42 U.S.C. § 1981 protects against race discrimination, a claim not asserted by Plaintiff, and does not provide an independent cause of action against a state actor.  *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 735 (1983); *Oden v. Oktibbeha Cty.*, 246 F.3d 458, 462-64 (5th Cir.), *cert. denied*, 534 U.S. 948 (2001).

Summary judgment is granted as to Plaintiff's claims under 42 U.S.C. §§ 1981 and 1983.

## IV.  CONCLUSION

For all of the foregoing reasons, it is hereby

**ORDERED** that Defendants' Motion for Summary Judgment is **GRANTED**. A separate final judgment will issue.

SIGNED at Houston, Texas, this **6th** day of **March, 2008**.

_____
Nancy F. Atlas
United States District Judge